1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SCOTT MICHAEL CHERMS,                    No.  2:13-cv-2124 KJN P

12                  Petitioner,

13         v.                                 ORDER

14   P.D. BRAZELTON, Warden,

15                  Respondent.

16

17   Introduction

18         Petitioner is a state prisoner, proceeding pro se, with a petition for writ of habeas corpus

19   pursuant to 28 U.S.C. § 2254.  Both parties consented to proceed before the undersigned for all

20   purposes.  See 28 U.S.C. § 636(c).  Petitioner challenges his 2009 conviction for rape of a

21   developmentally disabled person, and other charges.  Petitioner is serving a sentence of 16 years

22   in state prison.

23         The petition raises two claims:  (1) the trial court improperly denied petitioner's request

24   for a pretrial fitness report and hearing in the juvenile court; and (2) jury instruction error.  After

25   carefully reviewing the record, the undersigned denies the petition.

26   Standards for a Writ of Habeas Corpus

27         An application for a writ of habeas corpus by a person in custody under a judgment of a

28   state court can be granted only for violations of the Constitution or laws of the United States.  28

1

U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

////

2

1    The court looks to the last reasoned state court decision as the basis for the state court

2    judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If there is no reasoned decision,

3    "and the state court has denied relief, it may be presumed that the state court adjudicated the

4    claim on the merits in the absence of any indication or state-law procedural principles to the

5    contrary." Harrington, 131 S. Ct. at 784-85. That presumption may be overcome by a showing

6    that "there is reason to think some other explanation for the state court's decision is more likely."

7    Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

8    "When a state court rejects a federal claim without expressly addressing that claim, a

9    federal habeas court must presume that the federal claim was adjudicated on the merits – but that

10   presumption can in some limited circumstances be rebutted." Johnson v. Williams, 133 S. Ct.

11   1088, 1096 (2013). "When the evidence leads very clearly to the conclusion that a federal claim

12   was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of

13   the claim. Id., at 1097.

14   Where the state court reaches a decision on the merits but provides no reasoning to

15   support its conclusion, the federal court conducts an independent review of the record.

16   "Independent review of the record is not de novo review of the constitutional issue, but rather, the

17   only method by which we can determine whether a silent state court decision is objectively

18   unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Where no reasoned

19   decision is available, the habeas petitioner has the burden of "showing there was no reasonable

20   basis for the state court to deny relief." Harrington, 131 S. Ct. at 784. "[A] habeas court must

21   determine what arguments or theories supported or, . . . could have supported, the state court's

22   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

23   arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at

24   786.

25   Factual Background

26   In its unpublished memorandum and opinion affirming petitioner's judgment of

27   conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

28   following factual summary:

3

A. Sexual Assault of Raquel

Raquel has been a client of the Alta California Regional Center, which provides services to the developmentally disabled, since she was born. She has been diagnosed with moderate mental retardation and epilepsy, and has a history of seizures.

At the time of the trial, Raquel was 35 years old, and lived with her two children, ages two and four, and her partner. She was not capable of raising a child without help. Her mother took care of her finances. Raquel also had two older children. One lived with Raquel's mother, and one had been adopted by Raquel's sister.

Linda M., Raquel's mother, testified that Raquel went to a friend's house on January 18, 2000, with her cousin, Cassandra Doe (Cassandra). Cassandra was not related to Raquel, but Raquel referred to Cassandra as her cousin. They left in the early evening, while it was still daylight.

When the girls did not return in the time Linda M. had told them to return, she went looking for them, but could not see them anywhere. Sometime later, after getting a phone call from the girls, Cassandra's mother left and came back with the girls. Both girls were crying and had grass in their hair and tears in their clothing. Linda M. could smell alcohol on Cassandra's breath. Cassandra appeared very drunk, could not stand up, and was vomiting. Raquel, too, smelled as if she had been drinking. Raquel was on medication for her seizures, and was not supposed to drink alcohol. Raquel was also feeling a little sick, but was not vomiting. The only thing Raquel told Linda M. was that she had been raped. Linda M. called the police. They came and took a report, and both girls were taken to the hospital.

The details of Raquel's account of the incident varied. She told her story five separate times.

1. Raquel's Testimony

Raquel testified at the trial. She said that she and Cassandra went to the park with six boys she did not know, but whom Cassandra knew. She said she drank one beer, but she did not know what was inside the beer. She testified that one of the boys dragged her to the gutter, then he went after Cassandra. She said that one of them forced her, and put his penis in her vagina. He was a White guy. She saw Cassandra on the grass with people on top of her. She heard Cassandra say she needed help, and Raquel tried to go help her. After the boy ran away, Raquel helped Cassandra up and they walked to a neighbor's house to get help. When they got home she felt dizzy, but Cassandra was "kind of drunk."

2. Raquel's Statement to Officer Prizmich

Officer Dennis Prizmich responded to the 911 call regarding the sexual assault of Raquel and Cassandra. Raquel told Prizmich that they were sitting in the park with the six boys, talking and drinking

4

for about three hours.  When the girls said they had to get home, all of the boys grabbed both of them and dragged them to the back of the park near the fence.  Two or three of the males pushed Raquel through a hole in the fence along the creek.  One of the two White males, a Mexican male, and Joe (who was one of the Black males) held her down on the ground.  The White male held her arms and the Mexican male and Joe pulled her pants, panties, and shoes off. The Mexican male tried to get between her legs, but Joe (the Black male) got there first.  She told them to stop, but they would not.

After Joe finished with her, he climbed up the embankment and went over to where the others had Cassandra on the ground.  Raquel got dressed and went toward Cassandra.  She saw a White male with blond hair between Cassandra's legs.  Cassandra did not have on any pants or panties, and was saying she needed help.  The guys said they had better go before the cops showed up, and they all took off running.

Raquel helped Cassandra get dressed, and tried to get her up and walking, but she could not walk.  Cassandra kept saying she felt dizzy and needed to sit down.  They finally got to a house, where Raquel asked to use the telephone.   Raquel called Cassandra's mother, who came to pick them up.  Cassandra was having a hard time breathing, and her mother took her to the hospital.  Officer Prizmich took Raquel to the medical center for a rape exam.

3.  Raquel's Statement to the Nurse

Raquel told the nurse who examined her that she had been given Kool-Aid, which she later found out contained vodka.  She said she felt drunk after drinking the Kool-Aid.  She also said that two people out of a group of at least four assaulted her.  She said all four were African-American males.  She reported only one of them had penetrated her vagina with his penis.  She claimed that in addition to vaginal penetration, one of the males' penises had penetrated her rectum.  She claimed one of the assailants made her orally copulate his penis and one of the assailants orally copulated her anal area.  She was also made to masturbate one of the assailants, after which he ejaculated on his own leg.

Raquel reported that her tailbone hurt from being pushed onto the concrete, and her clothes were wet.  She had scratches on her arms and soreness to her vaginal area.  She also had some superficial anal tearing.

The nurse took oral, vaginal, rectal, and cervical swabs from Raquel.  These, plus Raquel's underwear and blood samples were sent to the county crime lab.

4.  Raquel's Multi–Disciplinary Interview Center Interview

Approximately one month after the attack, on February 17, 2000, Raquel was taken the multi-disciplinary interview center, where her interview was videotaped.  The videotape was played for the jury. She told the interviewer that six boys had been at the park, and she

5

named Nathan, Tony, and Scott.  She told the interviewer that the person who touched her "private" was Tony, and that he put his finger inside her.  Tony took his pants off and put his penis inside her vagina.  She stated that no one else had touched her.  She said Scott raped Cassandra.

5. Raquel's Statement to Detective McBeth-Childs

Sophia McBeth-Childs met Raquel for the first time on May 9, 2006, when McBeth-Childs was working as a detective in the Sacramento County Sheriff's Department.  Raquel told McBeth-Childs that she remembered drinking three wine coolers, and that she had felt drunk.  Raquel reported that when she and Cassandra said they had to go, "they" dragged her to the creek area and the guys held her down.

Raquel gave McBeth-Childs more identifying characteristics of her attacker whose name was Joe.  She said he was husky and kind of heavy, which was why she had been unable to get him off of her.  She also said he was shorter than she, and that he seemed young -- 17 or so.  She thought he was half Black and half White.  She said he smelled like "weed" and had a tattoo on his upper right arm.  She also thought he had braces.

B. Sexual Assault of Candy (against defendant Wolfe)

Candy testified that she reported being raped on May 9, 1997.  She was living in North Highlands at the time.  She was headed home on her bicycle after buying a cup of coffee at 7-Eleven around 4:00 a.m., when she cut though a field behind a shopping center.  She ran into two African-American males she did not know, who asked her for a cigarette.  She stopped, got off her bike, and gave them a cigarette.  They introduced themselves as Marty (later identified as defendant Wolfe) and Jeff.  They tried to persuade her to go home with them and "do a line" of crank, but she refused.

Marty came up behind her and caught her neck in the crook of his elbow as she was talking to Jeff.  Marty told her she needed to lie down and cooperate, or they would "take" it from her.  She was terrified, and perceived they meant to rape her.  She begged them to let her go, and told them they could have her bike and the money in her pocket.

Marty took off her pants and underwear.  He tried to take off her shirt, but she prevented it.  Both Marty and Jeff had intercourse with her.  Neither used a condom.  Each watched while the other raped her.  After they both finished, they walked away.

Candy went to a Chevron station, where someone called the sheriff's department for her.  When the officers arrived, Candy took them to where the attack occurred.  There they found Candy's comb, sunglasses, and cup of coffee.  Candy described her attacker to the officers.  She identified defendant Wolfe (Marty), and testified he looked pretty much the same then as now.

Candy was taken to a hospital, where she was examined. Swabs were collected from her cervix and vagina. There were nonmotile (nonmoving) sperm in the specimen collected from her vagina. She had abrasions on her back and bruising on her leg. There was vegetation around her vaginal area. There were no injuries inside or outside the vagina, but this was not inconsistent with rape.

Nothing happened with her case until 2007 when she was contacted by Sacramento County Sheriff's Detectives Bradley Jones and Sophia McBeth-Childs. They showed her a photographic lineup. She immediately recognized defendant Wolfe.

The detectives were able to link Candy's case with Raquel's 2000 sexual assault case by DNA evidence, although they were unaware to whom the DNA belonged until late 2006. There were two victims in the 2000 case: Raquel and Cassandra. Both Raquel and Cassandra were contacted, but Cassandra was the only victim that knew some of the suspects involved. Because she was unwilling to cooperate, the detectives had to close the case in May 2006.

C. Investigations After DNA Hit

McBeth-Childs testified that she had made attempts to locate and talk to Cassandra, but that Cassandra had been uncooperative. This initially affected her decision not to move forward with the case in 2006. Then, in December of 2006, she was advised that there had been a DNA hit identifying defendant Cherms. Raquel was then shown a photographic lineup containing Cherms's picture. She did not identify Cherms. On a different day, McBeth-Childs showed Raquel a photographic lineup containing defendant Wolfe's picture. Raquel also did not identify Wolfe.

The detectives engaged in a series of telephone calls with Cherms, which were recorded and played for the jury. The detectives met with defendant Wolfe on February 28, 2007. They met in a parking lot at Wolfe's request, stayed in their respective vehicles, and talked to each other through the open car windows. The interview was recorded, and the recording was played for the jury. During the interview, the detectives showed Wolfe several photographs, including Raquel and Cassandra. Wolfe identified both girls, but did not know their names. At the meeting, the detectives asked Wolfe to provide a DNA sample, but he refused. They later obtained a search warrant for a buccal swab.FN4

FN4. A buccal swab is a long cotton swab used to take a sample of a person's DNA by collecting saliva from between the person's cheek and gum.

In April 2007, the detectives contacted defendant Cherms while he was in jail on another charge. After discussing the case with him, they realized they had not given him his Miranda warnings.FN5 They went back to the jail, Mirandized him, and talked to him a second time. Recordings of both interviews were played for the jury.

FN5. *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

The detectives showed Cherms several photographs, including photos of Raquel and Cassandra. He recognized Cassandra, and knew her by name. He said at first he did not recognize Raquel, but later acknowledged she had been there in the park.

D. DNA Evidence

McBeth-Childs testified that in March and April, 2007, she collected buccal swabs from Wolfe and Cherms. She sealed the envelopes containing the swabs, and sent them to the crime lab.

Deven Johnson, a criminalist in the DNA section of the Sacramento County District Attorney's crime laboratory, testified. Johnson testified that she did DNA testing on Raquel's underwear, and examined her vaginal and rectal swabs. She also did the reference samples for Raquel, Wolfe, and Cherms.

From Raquel's underwear, Johnson extracted a sperm and nonsperm profile. The nonsperm fraction was consistent with Raquel's DNA profile. The sperm fraction was a mixture of two males. Johnson was able to split the mixture into a major contributor and a minor contributor. This means that sperm from one of the contributors was present in greater quantities than the sperm from the other contributor.

The major contributor was consistent with defendant Cherms's DNA profile. The probability of that profile occurring at random in the Caucasian population (Cherms is White) is 1 in 24 quintillion. The minor contributor was consistent with defendant Wolfe's DNA profile. Only a partial profile was possible on the minor contributor. The probability of that profile occurring among unrelated individuals in the African-American population is 1 in 10 trillion. The probability of the profile occurring among unrelated individuals in the Caucasian population is 1 in 2 trillion, and the probability of it occurring in the Hispanic population is 1 in 150 trillion.

Johnson also examined the vaginal and rectal swabs taken from Raquel. She found some sperm on the vaginal swabs. After subtracting out Raquel's DNA profile, there was a mixture of two individual's DNA. The major contributor was consistent with Cherms (probability of 1 in 6 quintillion of the Caucasian population). The minor contributor, again a partial profile, was consistent with Wolfe (probability of 1 in 700 billion African-Americans, 1 in 160 billion Caucasians, and 1 in 1 trillion Hispanics). There was sperm on the rectal swab, but the quantity was insufficient to develop a profile.

Kristen Bejarano, another criminalist in the DNA section of the Sacramento County District Attorney's crime laboratory, testified. She analyzed a DNA sample taken from Candy's underwear. The nonsperm fraction from the underwear was the same as Candy's reference DNA sample. The sperm fraction from the underwear

was the same as the profile from Wolfe's reference sample. The probability of the sperm fraction's DNA profile occurring at random in unrelated individuals was 1 in 28 quadrillion of the African-American population, 1 in 4 quadrillion of the Caucasian population, and 1 in 520 quadrillion of the Hispanic population. Bejarano also tested DNA collected from Candy's vaginal and cervical swabs. The vaginal swab contained a mixture of at least three individuals. After subtracting Candy's DNA profile, Bejarano found the remaining profile was a mixture of two males. Bejarano subtracted Wolfe's DNA profile as well. The person who donated the third DNA sample was unknown at the time of trial. As to the mixture of sperm DNA off of Candy's vaginal swab, 1 in 30 million African-American, 1 in 3 million Caucasians, and 1 in 5 million Hispanics would be included in the mixture. The results of the cervical swab were nearly identical.

(ECF No. 12-1 at 3-6.)

Discussion

First Claim

Petitioner argues that he was a minor, 17 years old, at the time of the January 18, 2000 offense, and was denied his due process rights when the trial court refused his request for a pretrial report and hearing on his amenability to juvenile court adjudication. (ECF No. 1 at 5.) Petitioner also argues that his Eighth Amendment rights were violated by the trial court acting "in excess of jurisdiction." (ECF No. 1 at 5.) At bottom, petitioner contends he was entitled to a fitness hearing before the juvenile court. Respondent counters that such claim fails to present a federal question because it involves solely the interpretation of state law, and the state court's denial of petitioner's jurisdiction claim is not contrary to any clearly established Supreme Court authority. (ECF No. 12 at 19, 23.) The undersigned agrees with respondent.

The California Court of Appeal is the last state court to issue a reasoned decision addressing petitioner's claim. Accordingly, the undersigned considers whether the denial of this claim by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority.

The California Court of Appeal denied petitioner's claim for the reasons stated herein:

Fitness Hearing

Defendant Cherms was 17 years old when he raped Raquel in January 2000. He was 24 years old at the time of his arrest in 2007, and 26 years old at the time of trial.

9

When the crime occurred, section 602, subdivision (a), of the Welfare and Institutions Code stated in pertinent part:

"Except as provided in subdivision (b), any person who is under the age of 18 years when he or she violates any law of this state or of the United States or any ordinance of any city or county of this state . . . is within the jurisdiction of the juvenile court, which may adjudge the person to be a ward of the court."

Subdivision (b) is not applicable to Cherms, thus subdivision (a) is the applicable subdivision.

Welfare and Institutions Code section 707, subdivisions (b) and (c), provide that where a person described in Welfare and Institutions Code section 602, was 14 years of age or older at the time the person was alleged to have violated certain offenses, including forcible rape, "upon motion of the petitioner made prior to the attachment of jeopardy the court shall cause the probation officer to investigate and submit a report on the behavioral patterns and social history of the minor being considered for a determination of unfitness."   (Welf. & Inst. Code, § 707, subd. (c).)   Following submission of this report, the juvenile court makes a determination of fitness, and the person is "presumed to be not a fit and proper subject to be dealt with under the juvenile court law[,]" unless there is evidence of extenuating or mitigating circumstances based on the following criteria:   "(1) The degree of criminal sophistication exhibited by the minor[;] [¶] (2) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction[;] [¶] (3) The minor's previous delinquent history[;] [¶] (4) Success of previous attempts by the juvenile court to rehabilitate the minor [; and] [¶] (5) The circumstances and gravity of the offenses alleged in the petition to have been committed by the minor." (*Ibid.*)

On September 13, 2009, prior to jury voir dire, the trial court indicated that in preparing for the case, it had discovered that Cherms was 17 years old on the date of the offense.   The court stated it assumed there was a waiver of a fitness hearing.   Cherms's attorney indicated that Cherms wanted a fitness hearing.   The trial court expressed its opinion that it was "extremely unlikely that Mr. Cherms would be found fit to stay within the jurisdiction of the Juvenile Court, given his age now, his criminal record, [and] the nature of the charge against him in the sexual assault case. . . ." The court further stated its opinion that the trial could go forward and the fitness hearing could be conducted after the trial.   The court expressed reluctance to send Cherms to juvenile court because codefendant Wolfe had a right to a speedy trial.

The trial court made the decision to proceed to trial with both defendants, finding there had been a failure to object to adult court jurisdiction in a timely manner.   The court also stated that Proposition 21 FN10, which was enacted a few months after the offense, would have given the prosecutor the right to file the case against Cherms directly in adult court.   The court indicated it thought Proposition 21 acted prospectively, since it related to the

procedure to be followed, and that the case against Cherms could be direct-filed even though the crime was committed before the passage of Proposition 21.

FN10. Proposition 21 amended Welfare and Institutions Code section 707, subdivision (d), to give a prosecutor the discretion to prosecute a minor either in criminal court or in juvenile court when the minor is alleged to have committed a specified crime at a specified age -- including defendants' ages and the crimes they committed. (Prop. 21, as approved by voters, Primary Elec. (Mar. 7, 2000).)

The prosecutor indicated she believed Cherms was entitled to a fitness hearing. She specifically stated that although some portions of Proposition 21 might be more procedural in nature, the aspect that allowed the district attorney to direct-file cases in adult court creates ex post facto issues, and would not be applied retroactively.

After the verdicts were returned, the trial court requested that the probation department prepare a fitness report, evaluating Cherms under the appropriate fitness criteria set forth in Welfare and Institutions Code section 707. The report found: (1) Cherms displayed a significant degree of criminal sophistication, making him unfit for juvenile court under the first criteria; (2) because Cherms was over the age of 25, he could not be rehabilitated prior to the expiration of juvenile court's jurisdiction, making him unfit under the second criteria; (3) Cherms had a relatively minor juvenile delinquency history prior to the offense, thus was found fit under the third criteria; (4) because Cherms's prior criminal record was insignificant, previous attempts by the juvenile court to rehabilitate him would be considered successful, thus he was fit under the fourth criteria; and (5) the circumstances and gravity of the offense rendered him unfit under the fifth criteria. The report concluded Cherms was unfit for juvenile court.

The trial court adopted the findings and conclusion of the probation report, stating that "to insist on a formal fitness hearing, as is conducted in the Juvenile Court, would elevate form over substance in this particular instance."

Cherms claims the trial court erred in failing to send the case to juvenile court for a fitness hearing, and that the adult court lacked jurisdiction to proceed in the absence of a fitness hearing. As a result, he claims this court is required to reverse his convictions on counts 3 and 4.

Respondent argues: (1) Cherms waived his right to trial in juvenile court by failing to raise the issue in a timely manner; (2) direct-filing of charges in the superior court did not violate ex post facto laws because Proposition 21, which took effect after Cherms committed the instant offenses and which authorized a prosecutor to file criminal charges directly in adult court without a prior fitness hearing, amounted to a procedural change that was outside the reach of the ex post facto clause; and (3) any error was harmless beyond a reasonable doubt.

We agree with Cherms that his request for a fitness hearing was timely raised and was not waived. However, because we shall conclude that any error was harmless, we need not determine whether the prosecutor could have relied on Proposition 21 to direct-file the charges in adult court.

A defendant may waive the right to be tried as a juvenile by failing to object in a timely fashion. (*Jose D. v. Superior Court* (1993) 19 Cal.App.4th 1098, 1101.) Respondent stresses the fact that Cherms did not raise the question of age until two years and four months after the charges were filed against him. However, Welfare and Institutions Code section 707, which governs the fitness hearing at issue states in pertinent part:

"In any case in which a minor is alleged to be a person described in subdivision (a) of Section 602 by reason of the violation, when he or she was 16 years of age or older, of any criminal statute or ordinance except those listed in subdivision (b), *upon motion of the petitioner made prior to the attachment of jeopardy* the court shall cause the probation officer to investigate and submit a report on the behavioral patterns and social history of the minor being considered for a determination of unfitness. . . ." (Welf. & Inst. Code, § 707, subd. (a)(1), italics added.)

The statutory language sets forth the time limit for bringing a motion for a fitness hearing. This defines the timeliness of the motion. By statute, a motion is timely if it is made before the attachment of jeopardy. Jeopardy attaches when the jury is sworn. (*People v. Riggs* (2008) 44 Cal.4th 248, 279, fn.12.)

Cherms indicated to the trial court on September 13, 2009, that he would not waive his right to a fitness hearing. Jury voir dire began on August 18, 2009. Cherms did not waive his right to a fitness hearing. Nevertheless, the failure to obtain a formal juvenile court fitness determination was harmless error.

The California Constitution provides: "[n]o judgment shall be set aside . . . in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) A "'miscarriage of justice' should be declared only when the court. . .is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Failure to hold a fitness hearing does not result in the superior court's lack of subject matter jurisdiction, but instead results in an excess of jurisdiction. (*In re Harris* (1993) 5 Cal.4th 813, 838-840.) A court acts in excess of jurisdiction "where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites."

(*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288.)

Where the irregularity is not jurisdictional in the fundamental sense, it is subject to a harmless error analysis.  (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [failure to allow public preliminary hearing was not jurisdictional in the fundamental sense, and was reviewed under appropriate standard of prejudicial error]; *In re Wright* (2005) 128 Cal.App.4th 663, 673.)

This court has applied a *Watson* FN11 harmless error analysis in similar circumstances, holding that "'a "miscarriage of justice" should be declared only when the court . . . is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]"  (*People v. Villa* (2009) 178 Cal.App.4th 443, 453 (*Villa* ).)  In *Villa*, we held that a failure to conduct a fitness hearing under subdivision (c) of section 1170.17 was subject to analysis for harmless error.  (*Villa*, *supra*, at pp. 452-453.)  That subdivision provided that under certain circumstances, a juvenile charged and tried in criminal court was subject to disposition under juvenile court law unless the district attorney demonstrated the person was unfit to be dealt with under juvenile court law.  (*Id.* at p. 451.)

FN11. *People v. Watson* (1956) 46 Cal.2d 818.

*Villa* held that the trial court erred in not requiring the district attorney to file and prevail on a motion under section 1170.17, subdivision (c), before sentencing the defendant in criminal court. ( *Villa*, *supra*, 178 Cal.App.4th at p. 451.)  We recognized that the failure to hold a Welfare and Institutions Code section 707 fitness hearing was jurisdictional, but stated that the defendant had not shown that the failure to hold a fitness hearing under section 1170.17 was jurisdictional.  (*Villa*, *supra*, at p. 453.)  However, we also stated that the defendant did not "explain how, even if such a failure were jurisdictional in nature, it overcomes the harmless error analysis compelled by the California Constitution."  (*Ibid.*)

It is not reasonably probable Cherms would have obtained a more favorable result had he obtained a formal determination from the juvenile court, because it is not reasonably probable he would have been found fit for treatment in juvenile court. Because a charge of forcible rape was alleged against Cherms, and because he was 14 years of age or more at the time of the offense, he would have been "presumed to be not a fit and proper subject to be dealt with under the juvenile court law. . . ." (Welf. & Inst. Code, § 707, subd. (c).)

In evaluating his fitness for treatment as a juvenile, the court would have considered the degree of his criminal sophistication, whether he could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, his previous delinquent history, the success of previous attempts to rehabilitate him, and the circumstances and gravity of the offenses alleged against him.  (Welf. & Inst. Code, § 707, subd. (c).)  As stated, the probation report determined that Cherms was unfit under every factor except his previous history

and the previous attempts to rehabilitate him.  Significantly, by the time Cherms advised the trial court that he would assert his right to a juvenile fitness hearing, the juvenile court's jurisdiction had already expired because of his age.  The chances of his being rehabilitated before the juvenile court's jurisdiction expired was zero.

Cherms admits, "[t]here can be no argument that based solely on the nature of the offenses charged in count 1 through 6 (or now, based solely on the nature of the convictions obtained on those counts), appellant would have been found an unfit subject for juvenile court adjudication."  Cherms nevertheless argues that had a juvenile court fitness determination been made, it would have been required to consider his criminal history and his parents' comments about his social history.

Even though the probation report required prior to a fitness hearing "is intended to inform the juvenile court of matters material to the issue of fitness other than the types of offenses allegedly committed[,]" there was no miscarriage of justice here.  (*Raul P. v. Superior Court* (1984) 153 Cal.App.3d 294, 299-300.)  A probation report was prepared that concluded Cherms was unfit for treatment as a juvenile.  This report considered Cherms's history as well as the charges against him.  Also, as indicated, there was no chance that Cherms could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, since Cherms did not assert his right to a fitness hearing until after he turned 25.  Cherms's history as a juvenile was insufficient to overcome the presumption against his treatment as a juvenile.  It is not reasonably probable he would have been declared fit to be treated as a juvenile.  The error was harmless.

(ECF No. 12-1 at 10-14.)

### Analysis

Petitioner styles his first claim as a due process and Eighth Amendment violation, and in his traverse, cites several federal court decisions.  However, petitioner's claim that he was entitled to a fitness hearing before the juvenile court fails to present a federal question because it involves only the interpretation of state law.  A challenge to a state court's interpretation of state law is not cognizable in a federal habeas corpus petition.  See Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009) ("[W]e have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Rivera v. Illinois, 556 U.S. 148, 158 (2009) ("[A] mere error of state law . . . is not a denial of due process"); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law . . . binds a federal court sitting in federal habeas"); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (federal habeas corpus relief does

1    not lie for errors of state law).  A habeas petitioner may not "transform a state-law issue into a

2    federal one" merely by asserting a violation of due process.  Langford v. Day, 110 F.3d 1380,

3    1389 (9th Cir. 1997).  Rather, petitioner must show that the decision of the California Court of

4    Appeal somehow "violated the Constitution, laws, or treaties of the United States."  Little v.

5    Crawford, 449 F.3d 1075, 1083 (9th Cir. 2006) (quoting Estelle, 502 U.S. at 68).

6           Here, the prosecution filed the charges against petitioner directly in criminal court,

7    without first obtaining a fitness determination from the juvenile court.  Petitioner was charged

8    with crimes that occurred in January of 2000, when petitioner was 17 years old.  (Clerk's

9    Transcript ("CT")  150.)  Petitioner was a minor at the time the offenses were committed, and

10   Proposition 21 was not enacted until March of 2000; thus, at trial, petitioner contended that he

11   was entitled to a fitness hearing before the juvenile court.  However, petitioner's case was

12   complicated because he was not charged or arrested for the offenses until 2007, when he was 24

13   years old.  By the time trial started in August of 2009, petitioner was 25[1] years old.  (CT  17, 68,

14   447.)  Juvenile court jurisdiction over a juvenile offender expires when the juvenile turns 21 years

15   old; the California Youth Authority loses jurisdiction over a juvenile offender when the juvenile

16   turns 25 years old.  See, e.g., Cal. Penal Code § 1170.17; Cal. Welf. & Inst. Code § 1732.6;

17   People v. Thomas, 35 Cal.4th 635, 27 Cal.Rptr.3d 2 (2005).

18          The Supreme Court has defined specific rights applicable to juvenile offenders.  See, e.g.,

19   Miller v. Alabama, 132 S. Ct. 2455 (2012) (it is unconstitutional to sentence a juvenile to life

20   without possibility of parole in a capital case); Graham v. Florida, 560 U.S. 48 (2010) (it is

21   unconstitutional to sentence juvenile offender to life without possibility of parole in a non-capital

22   case); Roper v. Simmons, 543 U.S. 551 (2005) (death sentence for juveniles under the age of 18

23   is unconstitutional);[2] Thompson v. Oklahoma, 487 U.S. 815 (1988) (death sentence for juveniles

24

25   [1]  The Court of Appeals stated that petitioner was 26 years old at the time of trial.  However,
     petitioner did not turn 26 until December of 2009.  (CT 68.)  This error does not change the

26   analysis because petitioner was 25 years old at the time of trial.

27   [2]  In addition, the defendant in Roper was seventeen years old at the time he committed the
     charged offenses but he was tried in adult court.  Roper, 543 U.S. at 557.  Although the Supreme

28   Court did not directly address the issue of the juvenile defendant's trial as an adult, it affirmed his

1   under the age of 16 is unconstitutional).  But the Supreme Court has not specifically addressed the

2   question of whether juveniles have a Constitutional right to a juvenile fitness hearing, or whether

3   a defendant who was a juvenile at the time of the offense may be tried as an adult.  In <u>Miller</u> and

4   <u>Graham</u>, the Supreme Court discussed, without addressing their validity or constitutionality,

5   juvenile transfer proceedings and how in some states prosecutors alone, without judicial

6   oversight, determine whether the juvenile is tried as an adult in criminal court or in juvenile court.

7   <u>Miller</u>, 132 S. Ct. at 2474-75; <u>Graham</u>, 560 U.S. at 74-80.  However, neither of these decisions

8   dealt with the issues of whether a juvenile has a constitutional right to a juvenile fitness hearing,

9   or whether a defendant who was a juvenile at the time of the commission of an offense may be

10  tried as an adult.  <u>Id.</u>  Rather, these cases only addressed the constitutionality of sentencing

11  juveniles (<u>id.</u>), which is not at issue here.  There is an absence of Supreme Court precedent on the

12  issue of a juvenile defendant's entitlement to a fitness hearing, and petitioner fails to cite to any

13  authority suggesting that his constitutional rights are violated under the circumstances set forth

14  herein.  Accordingly, petitioner's claim of his entitlement to a juvenile fitness hearing before the

15  juvenile court fails to raise a federal question.  <u>See</u> 28 U.S.C. § 2254(a); <u>Estelle</u>, 502 U.S. at 67-

16  68; <u>see</u> <u>Brewer v. Hall</u>, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent

17  creates clearly established federal law relating to the legal issue the habeas petitioner raised in

18  state court, the state court's decision cannot be contrary to or an unreasonable application of

19  clearly established federal law"); <u>see also</u> <u>Carey v. Musladin</u>, 549 U.S. 70, 76 (2006) (because

20  there was no Supreme Court precedent on the issue, the court could not find that the state court

21  unreasonably applied clearly established federal law).

22          For the above reasons, petitioner is not entitled to federal habeas relief with respect to his

23  first claim.

24          <u>Second Claim</u>

25          Petitioner argues that the trial court improperly instructed the jury that an aider and abettor

26  is equally guilty of the charged offense, using CALCRIM 400, in violation of petitioner's right to

27

28  sentence of life without the possibility of parole.  <u>Id.</u> at 560, 578-79.

a fair trial and his due process rights.  (ECF No. 1 at 7.)  Petitioner contends that the trial court

did not consult with defense counsel on the jury instructions, depriving petitioner of an

opportunity to seek modification to the jury instructions.  (Id.)  He argues that the terms "equally

guilty" improperly describes the prosecution's burden of proof in violation of In re Winship, 397

U.S. 358, 364 (1970).  Petitioner contends that the 2010 revision of CALCRIM 400 to delete the

word "equally" constitutes evidence that the term "equally" unfairly prejudiced criminal

defendants.  Petitioner argues that challenges to jury instructions affecting substantial rights are

not waived despite counsel's failure to object at trial.

Respondent counters that petitioner's claim is procedurally barred, fails to state a federal

question, and that the state court's denial of this claim was not an unreasonable application of

Supreme Court authority.  The undersigned agrees with respondent.

The California Court of Appeal is the last state court to issue a reasoned decision

addressing petitioner's claim.  Accordingly, the undersigned considers whether the denial of this

claim by the California Court of Appeal was an unreasonable application of clearly established

Supreme Court authority.

The California Court of Appeal denied petitioner's claim for the reasons stated herein:

CALCRIM No. 400

> Cherms argues the trial court erred when it instructed the jury pursuant to CALCRIM No. 400 that an aider and abettor is equally guilty of the charged offense.  Wolfe joins in the argument.

> Defendants argue that an aider and abettor's guilt may be less than the perpetrator's if the aider and abettor has a less culpable mental state.  Defendants cite, *inter alia*, *People v. McCoy* (2001) 25 Cal.4th 1111, 1120, which held that an aider and abettor may be guilty of a more serious crime than the perpetrator if the aider and abettor's mens rea is more culpable.  Following the reasoning of *People v. McCoy*, *supra*, the Court of Appeal for the Second District has held that an aider and abettor may be found guilty of a lesser offense than the perpetrator.  (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164-1165.)  We conclude the claim of error is forfeited, and that any error was harmless.

> In discussing jury instructions, the trial court asked whether any of the attorneys had any objection to CALCRIM No. 400.  Each one replied that they did not.  At the end of the discussion, the trial court asked each attorney whether they had requested any

instructions that were not included in the final draft.  They each indicated there were not.

Thereafter, the jury was instructed:

"A person may be guilty of a crime in two ways.  One, he may have directly committed the crime.  I will call that person the perpetrator.  Two, he may have aided and abetted a perpetrator who directly committed the crime.

"A person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it."

Defendants did not seek clarification of this instruction.FN14

FN14. CALCRIM No. 400 has been revised to delete the word "equally" from the second paragraph.

This court recently held that because the instruction "was generally accurate, but potentially incomplete in certain cases," it is incumbent on the defendant to request a modification if it is misleading on the facts of the case, and that "failure to do so forfeits the claim of error."  (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119.)

Moreover, any error was harmless beyond a reasonable doubt.  The reason courts have held CALCRIM No. 400 may be misleading in "exceptional circumstances" is that the jury may convict an aider and abettor of the same offense as the perpetrator, even though the aider and abettor had a less culpable mental state.  (*People v. Nero* (2010) 181 Cal.App.4th 504, 517-518.)  The liability of an aider and abettor must be assessed according to his or her own mens rea.  (*People v. Samaniego, supra*, 172 Cal.App.4th at p. 1164.) If the offense is a specific intent offense, "'"the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.'"'" [Citation.]."  (*Ibid.*)

Here, the jury sent the following question regarding the aider and abettor's mens rea to the trial court during deliberations:  "As for the statement 'the defendant knew that the perpetrator intended to commit the crime' can we please elaborate on this statement?  We have a question on what Intended means."

The court responded by referring the jury to CALCRIM No. 401, and elaborating that the aider and abettor must "know of and share the perpetrator's intent to commit the unlawful sexual acts charged in this case.  [CALCRIM No.] 401 provides some elaboration on that concept in the next paragraph:  'Someone aids and abets a crime if he knows the perpetrator's unlawful purpose. . . .'"  The court then used an example of a getaway driver, and told the jury the driver would not know what the perpetrator intended if the perpetrator merely asked the driver for a ride to the bank to make a

lawful withdrawal, and the driver had no reason to believe a robbery would occur.

CALCRIM No. 401, which was given to the jury, instructed them that a person "aids and abets a crime if he knows the perpetrator's unlawful purpose and he specifically intends to and does in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime.["]  The crime at issue in this case was rape in concert.

These instructions thoroughly apprised the jury of the mens rea required on the part of the aider and abettor.  Therefore, any error in also telling the jury that an aider and abettor is equally guilty of the perpetrator's crime was harmless beyond a reasonable doubt.

(ECF No. 12-1 at 17-19.)

Procedural Default

Initially, petitioner attempts to avoid procedural default by claiming that defense counsel was not consulted on the jury instructions.  However, the record reflects that the trial court discussed, off the record, the proposed jury instructions with defense counsel and the prosecution, apparently outside the presence of petitioner.  (See Reporter's Transcript ("RT") 1149, 1158.)  The trial court also reviewed the final set of proposed jury instructions with counsel for both parties on the record.  (RT 1158-69; 1171-72.)  However, both petitioner and his co-defendant were excused prior thereto.  (RT 1153.)  The record reflects that defense counsel did not object to jury instructions CALCRIM 400, 401 or 404 as set forth in the final draft jury instructions.  (RT 1167.)  Thus, petitioner's claim that his counsel was not consulted or given an opportunity to object to CALCRIM 400 is unavailing.

As set forth above, the California Court of Appeal concluded that petitioner forfeited this claim of jury instruction error by failing to object to the instruction at trial.  Respondent argues that petitioner's claim of instructional error is procedurally barred by the contemporaneous objection rule.  (ECF No. 12 at 27.)

When a state court's rejection of a federal claim is based on a violation of a state procedural rule that is adequate to support the judgment and independent of federal law, a habeas petitioner has procedurally defaulted his claim.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  A state procedural rule is adequate if it has been "well-established and consistently

1   applied."  Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003).  The procedural rule is

2   independent if it is not "interwoven with the federal law."  LaCrosse v. Kernan, 244 F.3d 702,

3   704 (9th Cir. 2001).  The Ninth Circuit has found this state procedural rule to be an adequate and

4   independent bar to federal habeas review.  See Paulino v. Castro, 371 F.3d 1083, 1093 (9th Cir.

5   2004); Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002); Vansickel v. White, 166 F.3d

6   953, 957-58 (9th Cir. 1999).  If a state procedural ground is an adequate and independent ground

7   for dismissal, a federal court will not consider the merits of the claims unless a petitioner can

8   show sufficient cause for the default and resulting prejudice, or show that a failure to consider the

9   claims would result in a fundamental miscarriage of justice.  See Coleman, 501 U.S. at 750.

10      Here, while the state appellate court indicated that petitioner forfeited his claim due to trial

11  counsel's failure to object to the jury instructions as given, the state court also adjudicated the

12  claim on the merits.  Moreover, given the often lengthy and complicated matter of procedural

13  default, particularly an analysis of cause and prejudice, it appears that the interests of judicial

14  economy counsel in favor of reaching the merits of this claim.  See Franklin v. Johnson, 290 F.3d

15  1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the

16  merits issues presented by the appeal, so it may well make sense in some instances to proceed to

17  the merits if the result will be the same."), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)

18  ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only

19  that it ordinarily should be.")  In this case, as discussed below, petitioner's jury instruction claim

20  is without merit.  Therefore, an analysis of the merits of this claim appears less complicated and

21  time-consuming than a lengthy discussion of cause and prejudice.

22              Jury Instruction Claim

23      Jury instruction issues are generally matters of state law for which federal habeas relief is

24  not available.  Estelle, 502 U.S. at 67-68.  A federal habeas court does not review jury

25  instructions to determine whether they violate state law, as federal habeas relief "does not lie for

26  errors of state law."  Jeffers, 497 U.S. at 780.  To obtain federal collateral relief for errors in the

27  jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial

28  that the resulting conviction violates due process.  See Estelle, 502 U.S. at 72.  Additionally, the

20

1    instruction may not be judged in artificial isolation, but must be considered in the context of the

2    instructions as a whole and the trial record.  See id.  The court must evaluate jury instructions in

3    the context of the overall charge to the jury as a component of the entire trial process.  See United

4    States v. Frady, 456 U.S. 152, 169 (1982).  Furthermore, even if it is determined that the

5    instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the

6    unconstitutional instruction had a substantial influence on the conviction and thereby resulted in

7    actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), which is whether the

8    error had a substantial and injurious effect or influence in determining the jury's verdict.  See,

9    e.g., Hedgpeth v. Pulido, 555 U.S. 57, 61-62 (2008) (per curiam).

10        Here, petitioner asserts that the words "equally guilty" in the aider and abettor instruction

11    were erroneous and relieved the prosecution's burden of proof.  But petitioner is not entitled to

12    federal habeas relief on this claim for the following reasons.  The jury was specifically instructed

13    that they could not convict the petitioner unless his guilt was proven beyond a reasonable doubt.

14    (RT 1179.)  The jury was also instructed that a person is equally guilty of a crime whether he

15    committed it personally or aided and abetted it.  (RT 1194.)  The trial court then immediately

16    explained to the jury that to prove that the petitioner is guilty of a crime based on aiding and

17    abetting, the prosecutor had to prove that, "One, the perpetrator committed the crime; two, the

18    defendant knew that the perpetrator intended to commit the crime; three, before or during the

19    commission of the crime, the defendant intended to aid and abet the perpetrator in committing the

20    crime; and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's

21    commission of the crime."  (RT 1194.)  The judge then explained:

22            Someone aids and abets a crime if he knows the perpetrator's
              unlawful purpose and he specifically intends to, and does in fact,
23            aid, facilitate, promote, encourage, or instigate the perpetrator's
              commission of that crime.
24
25            If all of these requirements are proved, the defendant does not need
              to actually have been present when the crime was committed to be
26            guilty as an aider and abettor.

27            If you conclude that a defendant was present at the scene of the
              crime or failed to prevent the crime, you may consider that fact in
28            determining whether that defendant was an aider and abettor.
              However, the fact that a person is present at the scene of a crime or

1   fails to prevent the crime does not, by itself, make him an aider and
    abettor.

2

3   (RT 1194.)

4        During deliberations, the jury had a question concerning the aiding and abetting

5   instruction:  "As for the statement 'the defendant knew that the perpetrator intended to commit

6   the crime[;]' can we please elaborate on this statement?  We have a question as what intended

7   means."  (Clerk's Transcript ("CT") 529.)  The trial court provided the following written

8   response:

9            The court understands this jury question as pertaining to what is
             required to prove aiding and abetting as set forth in Instruction 401,
10           specifically, the second requirement.  Basically, it sets forth the
             requirement that the aider and abettor know of and share the
11           perpetrator's intent to commit the unlawful sexual acts charged in
             this case.
12
             Instruction 401 provides some elaboration on that concept in the
13           next paragraph:  "Someone aids and abets a crime if he *knows the*
             *perpetrator's unlawful purpose . . . .*"
14
             The example of a getaway driver in a bank robbery illustrates the
15           concept:

16           A person drives his friend to a bank.  The friend gets out of the car,
             enters the bank and commits a robbery, then returns to the car,
17           which is then driven away.  The driver of the car would be guilty of
             the bank robbery as an aider and abettor if he knew that his friend
18           intended to rob the bank.  Even though the driver did not enter the
             bank, the act of driving the car to and away from the bank would be
19           viewed as aiding and abetting the friend's (i.e. perpetrator's)
             robbery.
20
             However, the driver of the car would not be guilty of aiding and
21           abetting the robbery if he did not know the perpetrator intended to
             rob the bank.  For example, if the driver's friend had merely asked
22           the driver for a ride to the bank so he could make a lawful
             withdrawal, and the driver had no reason to believe a robbery
23           would occur, it could not be said that the driver knew what the
             perpetrator intended.
24
             This supplement instruction should be considered along with the
25           instructions regarding commission of a sexual offense in concert
             (1001/1046) and aiding and abetting (400, 401, 404) as well [sic]
26           the other instructions in this case.

27  (CT 545-46.)

28  ////

                                          22

1  Petitioner fails to show any ambiguity or inconsistency in the jury instructions on aiding

2  and abetting.  See Waddington, 555 U.S. at 190-91 ("the defendant must show both that the

3  instruction was ambiguous and that there was a 'reasonable likelihood' that the jury applied the

4  instruction in a way that relieved the State of its burden of proving every element of the crime

5  beyond a reasonable doubt") (citations omitted).  As described above, the jury was specifically

6  instructed that the prosecution had to prove beyond a reasonable doubt the requisite elements of

7  aiding and abetting.

8  Thus, petitioner fails to show that the state appellate court's decision constituted an

9  unreasonable application of clearly established federal law and/or that it resulted in a decision

10  based on an unreasonable determination of the facts.  The California Court of Appeal reviewed

11  the instructions as a whole rather than in artificial isolation.  See Estelle, 502 U.S. at 72.

12  Petitioner's second claim is denied.

13  Conclusion

14  For all of the above reasons, petitioner's application for a writ of habeas corpus is denied.

15  Rule 11 of the Federal Rules Governing Section 2254 Cases states that "the district court

16  must issue or deny a certificate of appealability when it enters a final order adverse to the

17  applicant."  Id.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

18  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

19  § 2253(c)(3).  Under this standard, a petitioner must show that reasonable jurists could debate

20  whether the petition should have been resolved in a different manner or that the issues presented

21  were adequate to deserve encouragement to proceed further.  Miller–El v. Cockrell, 537 U.S. 322,

22  336 (2003), quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000).

23  For the reasons set forth above, the undersigned finds that petitioner has not met the

24  substantial showing required, and declines to issue a certificate of appealability.

25  Accordingly, IT IS HEREBY ORDERED that:

26  1.  Petitioner's application for a writ of habeas corpus is denied; and

27  ////

28  ////

23

1        2.  The undersigned declines to issue a certificate of appealability.

2    Dated:  March 18, 2014

3

4    /cherm2124.157                          KENDALL J. NEWMAN
                                             UNITED STATES MAGISTRATE JUDGE
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28